Maria Crimi Speth, # 012574
David S. Gingras, #021097
Laura Rogal, #025159
**JABURG & WILK, P.C.**
3200 North Central Avenue, Suite 2000
Phoenix, Arizona 85012
(602) 248-1000

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| XCENTRIC VENTURES, LLC, an Arizona limited liability company; and EDWARD MAGEDSON, an unmarried man,<br><br>        Plaintiffs,<br><br>v.<br><br>SARAH L. BIRD and JOHN DOE BIRD, wife and husband; SEOMOZ, INC d/b/a SEOMOZ.ORG, a Washington corporation,<br><br>        Defendants. | Case No: 2:09-cv-01033-ROS<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS** |

Plaintiffs XCENTRIC VENTURES, LLC and EDWARD MAGEDSON respectfully submit the following Response to Defendants SARAH L. BIRD and SEOMOZ, INC.'s Motion to Dismiss.

**I.   INTRODUCTION**

The background facts of this case are somewhat unusual. While every specific detail of the dispute is not necessarily germane to the issue before the Court (whether personal jurisdiction exists over Defendants), understanding the history of the parties and of this matter is useful to provide context to the pending motion. As such, a short summary of these points is offered prior to addressing the merits of Defendants' motion.

10297-45/DSG/DSG/725139_v1

1    Plaintiff Ed Magedson is a consumer advocate and is the founder of a website
2 called www.RipoffReport.com which was started more than 10 years ago. Mr. Magedson
3 is also the manager of Plaintiff Xcentric Ventures, LLC which is the entity which operates
4 and administers the Ripoff Report site. Mr. Magedson has lived in Arizona continuously
5 since the 1970s, and Xcentric is an Arizona-LLC with its sole place of business located in
6 Arizona.

7    The Ripoff Report website is a public forum (basically, a large message board)
8 where consumers can post complaints called "reports" about businesses or individuals
9 who they feel have wronged them in some manner. The site is 100% free to use; it
10 charges nothing to post reports or to review reports posted by others.

11    Typical reports might be as banal as a complaint about poor customer service at a
12 local car dealership or a pizza which did not arrive in 30 minutes as advertised. Reports
13 may also describe the victim's loss of his/her life savings in a large-scale Ponzi scheme.
14 Because the postings are submitted by third party users of the website across the country,
15 the range of topics discussed and the level of harshness involved is nearly limitless. As of
16 June 2009, the website contains more than 450,000 unique reports. Including
17 responses/rebuttals to reports, the site contains far in excess of 1,000,000 unique entries.

18    Xcentric and Magedson do not confirm or verify the accuracy of every statement
19 posted on the site. Other than removing profanity, obscenity, threats of violence, and
20 sensitive personal or private information such as social security numbers, user-submitted
21 reports are posted to the site in their original, unedited form.

22    For reasons unknown, information posted on the Ripoff Report website ranks
23 extremely high in search engines such as Google. As such, if a Ripoff Report is posted
24 about "ACME Construction Co.", a Google search for that company's name will likely
25 produce a link to the Ripoff Report story at or near the of Google's search results.

26    Because of this, the Ripoff Report has been sued numerous times in cases accusing
27 it of publishing false and defamatory information in reports. However, because of a
28 relatively obscure federal law known as the Communications Decency Act, 47 U.S.C. §

JABURG & WILK, P.C.
ATTORNEYS AT LAW
3200 NORTH CENTRAL AVENUE
SUITE 2000
PHOENIX, ARIZONA 85012

230(c)(1), Xcentric has never lost such a case. This is so because under the CDA, Congress granted interactive websites immunity from most forms of liability based on the accuracy of statements posted by third party users of the site. In short, the CDA simply prohibits a plaintiff from treating Xcentric or Magedson as the publisher/speaker of any statements which originated from a third party user of the site. The net effect of this law is that a defamed plaintiff is free to pursue the original author of a false statement, but it cannot hold Xcentric or Magedson liable for material which they did not create. *See Global Royalties, Ltd. v. Xcentric Ventures, LLC*, 544 F.Supp.2d 929 (D.Ariz. 2008) (finding Defendants entitled to CDA immunity as providers/operators of an interactive computer service); *GW Equity, LLC v. Xcentric Ventures, LLC*, 2009 WL 62173 (N.D. Tex. Jan. 9, 2009) (granting summary judgment in favor of Xcentric under the CDA); *Whitney Information Network, Inc. v. Xcentric Ventures*, LLC, 2008 WL 450095 (M.D.Fla. 2008) (granting summary judgment in favor of Xcentric under the CDA).

As these cases explain, the CDA provides broad protection to websites such as the Ripoff Report provided one condition is met—the allegedly defamatory material must not have been created by the website itself. Thus, if a *website itself* creates defamatory material, the CDA will not protect the site at all.

This brings us to the present dispute. As the name suggests, Defendant SEOmoz, Inc. is a Washington-state based company which is involved in the business of "search engine optimization" or "SEO". Defendant Sarah Bird is the SEOmoz's general counsel and is the author of a defamatory article which is the subject of this action.

In short, "search engine optimization" is a euphemism which applies to a variety of activities which, in short, attempt to alter (i.e., "optimize") the way a website ranks in search engines such as Google.[1] For instance, a website wanting to achieve higher visibility may perform SEO work designed to increase its ranking in Google's search results. Alternatively, if a webpage contains negative information criticizing a business,

---

[1] Google does not entertain requests for a specific page to appear either higher or lower in its results.

3

10297-45/DSG/DSG/725139_v1

that business may hire an SEO firm like SEOmoz to try and lower the ranking level of the negative page. This can be attempted in many different ways, but it is often done by flooding the Internet with small "junk" pages referring to the target company's name, the hope being that these junk pages will show up higher in search engine results thereby pushing the negative page lower in Google's rankings thus reducing its visibility.

By their nature, the pages appearing on Ripoff Report are prime candidates for some type of remedial response by the company named in the report. Among other options, Ripoff Report itself allows the reported company to file a free response or "rebuttal" to the complaint explaining their side of the story, offering to rectify the situation, or denying the validity of the complaint, if appropriate. The site charges no fees whatsoever for anyone wanting to file a rebuttal.

In addition to the free alternatives offered by Ripoff Report, another option for dealing with a negative report would be to pay a firm such as SEOmoz to perform SEO services to try and conceal the complaint. In an effort to convince more companies to use this option, on January 21, 2008, Defendant Bird posted an article on SEOmoz's website entitled "Anatomy of a RipOff Report Lawsuit" which is the basis for this litigation.

In the introduction of her article, Ms. Bird immediately launched into a barrage of false and defamatory statements accusing Ripoff Report of "violating Google's Terms of Service …", "promulgating defamatory content and then extorting money from the victims of the very libel it publishes … " and asking "Why can't RipOff Report be held responsible for its conduct?" While couched as an intellectual discussion of the Communications Decency Act and the history of unsuccessful lawsuits against Ripoff Report, Mr. Bird's article was, in fact, simply a marking campaign designed to incite anger and fear against Plaintiffs by falsely suggesting that the Ripoff Report was an "extortion scheme" with a "sordid legal history" involved in criminal violations of the Racketeer Influenced and Corrupt Organizations Act, among other things.

Why would Ms. Bird do this? Discovering the answer to that question is, of course, a task to be accomplished in the course of this litigation. However, Defendants

4

believe Ms. Bird's motives were simple—by defaming and demonizing the Ripoff Report and its founder, Ms. Bird hoped to increase SEOmoz's sales and its prominence in the SEO industry.  Put simply, as vendors and promoters of anti-Ripoff Report services, Ms. Bird and SEOmoz hoped to drum-up additional business by convincing readers that the Ripoff Report is "evil" and that Defendants' SEO services were the most effective way to combat the criminal activities which Ms. Bird accused Xcentric of committing.  Ms. Bird sought to accomplish this by convincing her audience that given a choice between: 1.) invoking the *free* complaint-remediation tools offer by Xcentric, or 2.) paying money to SEOmoz for SEO services to conceal negative postings, the stronger moral choice would be to hire SEOmoz or others in its industry.

Making matters worse, Ms. Bird's article did not only defame Plaintiffs with false factual assertions, it did something more.  Writing in her capacity as an attorney and self-proclaimed "law and technology blawger extraordinaire" Ms. Bird offered a specific set of instructions explaining to potential litigants how they could file frivolous lawsuits against Xcentric in a manner that would allow the Complaint to survive an initial Motion to Dismiss under Rule 12(b)(6). Knowing that the Communications Decency Act protects Xcentric from liability based on statements created by third parties, Ms. Bird explained that litigants could keep bogus cases alive longer (thus causing greater economic damage to Xcentric) by falsely alleging that Xcentric created or altered the posting at issue:

> Thus, if you're going to sue RipOff Report, it is very important to allege that the website created and/or substantially altered the meaning of the content.[1] <u>You need to allege facts that get you around the CDA immunity provisions in order to avoid being thrown out of Court</u>. (emphasis added)

Upon learning of the SEOmoz article, on March 21, 2008, Xcentric's Arizona counsel wrote to Ms. Bird in an email, a copy of which is attached as **Exhibit C** to the Declaration of David S. Gingras submitted herewith.  This email informed Ms. Bird that she would be contacted shortly by other attorneys representing Xcentric, and it explained to Ms. Bird that two of thecases involving Xcentric cited in Ms. Bird's article were no

5

1 longer pending (because they had both been terminated in Xcentric's favor; a fact not
2 noted in Ms. Bird's article).

3 Attached to the March 21, 2008 email were copies of two rulings, including an
4 order from the U.S. District Court for the Middle District of Florida granting summary
5 judgment in favor of Xcentric in *Whitney Information Network, Inc. v. Xcentric Ventures,*
6 *LLC*. In the ruling, the *Whitney* Court noted that "<u>Xcentric, is an Arizona limited liability
7 company that operates a website known as 'The Rip-Off Report'</u> …" at 10.

8 On March 27, 2008, Xcentric's counsel sent an 11-page letter to Ms. Bird
9 demanding numerous corrections and/or retractions. Some small corrections were made,
10 but most of these requests were ignored. In the letter, Xcentric also placed Ms. Bird on
11 notice that her instructions informing potential plaintiffs how they could "get around the
12 law" by making false factual allegations was an unlawful act of soliciting third parties to
13 commit torts against Xcentric which would expose Ms. Bird to liability:

> No plaintiff can allege that Xcentric "created and/or substantially altered the meaning of the content" without having a reasonable belief formed after a reasonable inquiry, that Xcentric actually performed those actions with regards to the statements that the plaintiff are claiming to be false or defamatory. Your statement essentially tells all potential litigants that if they want to sue Xcentric, they just need to allege that Xcentric authored or altered the defamatory content. Not only does your statement encourage your readers to file lawsuits against Xcentric that are not based on any facts, it is encouraging them to commit a tort, i.e. malicious prosecution. Statements like this are the reason why Xcentric must defend numerous frivolous lawsuits. Xcentric is dedicated to protecting its rights, and has instituted a policy of filing a malicious prosecution counterclaim against any plaintiff who has filed or continued any lawsuit against Xcentric without evidence of the allegations contained in the complaint. **Xcentric will not hesitate to name you as a co-defendant who aided and abetted a tort if it comes to our attention that a complaint was filed against Xcentric as a result of your statements**.

27 *See* Gingras Decl. **Exhibit E**. Despite this warning, Ms. Bird made no substantive
28 changes to her article other than posting a tiny footnote clarifying that despite her explicit

6

instructions to the contrary, litigants should not make knowingly false claims in their Complaints against Xcentric.

Several months later, as Xcentric feared would occur, on November 3, 2008, a lawsuit was filed in California against Xcentric and Magedson styled *A.H. Barnes v. Xcentric Ventures, LLC* (the "Barnes litigation"). Not only did the plaintiff in the Barnes litigation follow Ms. Bird's instructions on how to commence a groundless action, the Complaint literally quoted from Ms. Bird's article as factual support for the plaintiffs' claims:

> **Quote from ¶ 7 of Complaint;** *A.H. Barnes v. Xcentric*
> 7. Rip Off and Magdeson <u>have been widely accused of promulgating defamatory content and then extorting money from the victims of the very libel it publishes</u> resulting in <u>at least seventeen known lawsuits</u> filed against both Rip Off and Magdeson for any or all of a combination of claims for defamation, violation of the Communications Decency Act (42 U.S.C. § 230) [sic], violation of the Racketeer Influenced and Corrupt Organizations Act and extortion. (emphasis added)

> **Quote from "Anatomy Of A Ripoff Report Lawsuit"**
> It is no secret that RipOff Report <u>has been widely and universally accused of promulgating defamatory content and then extorting money from the victims of the very libel it publishes</u>. This business model has made RipOff Report the subject of many lawsuits. In fact, I have <u>at least seventeen</u> listed in the Appendix at the end of this post. (emphasis added)

*See* Gingras Decl. ¶ 17–18 & **Exhibit A**. Because the claims in the Barnes litigation were groundless, Xcentric and Magedson brought a Special Motion to Strike pursuant to Cal. Civ. Code § 425.16 which required the Plaintiff to demonstrate the existence of factual support for his claims sufficient to show a likelihood of success on the merits. Shockingly, the "evidence" produced by the Plaintiff included a copy of Ms. Bird's article about Xcentric and Magedson with various parts highlighted, including the false and defamatory statements which give rise to this action. *See* Gingras Decl. **Exhibit B**.

7

## II. ARGUMENT

### a. Although Plaintiffs Bear The Burden Of Establishing Jurisdiction, Factual Disputes Must Be Resolved in Plaintiffs' Favor

At the outset, it should be noted that when a district court considers a Motion to Dismiss under Rule 12(b)(2) without holding an evidentiary hearing, the plaintiff need only make a *prima facie* showing of jurisdictional allegations to defeat the motion. *See Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 268 (9th Cir. 1995); D*ata Disc, Inc. v. Sys. Tech. Assocs.*, 557 F.2d 1280, 1285 (9th Cir. 1977). In determining whether the plaintiff has met this burden, "uncontroverted allegations in the Complaint must be taken as true, and <u>conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor</u>." *Rio Properties, Inc. v. Rio Intern. Interlink*, 284 F.3d 1007, 1019 (9th Cir. 2002) (emphasis added) (citing *AT & T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588 (9th Cir. 1996)).

Here, as discussed below and as a matter of law, personal jurisdiction exists because Defendants have engaged in intentional tortious conduct targeted at Plaintiffs in Arizona and which was intended to cause, and which has actually caused, significant harm to occur within the State of Arizona. The <u>only</u> argument presented to contradict this conclusion is set forth in Paragraph 15 of Ms. Bird's declaration in which she states that she was unaware that Plaintiffs resided in Arizona. Based on this denial, Ms. Bird claims that she could not have foreseen being haled into Arizona to answer for her conduct.

Ms. Bird's denial is insufficient to demonstrate a lack of jurisdiction here because the denial is clearly contradicted by substantial evidence showing that Ms. Bird <u>did, in fact, know that Plaintiffs resided in Arizona</u>. Because any conflicting facts must be resolved in Plaintiffs' favor at this stage, Ms. Bird's self-serving denial does not demonstrate that this Court lacks jurisdiction over the Defendants. *See Bonner v. Minico, Inc.*, 159 Ariz. 246, 254, 766 P.2d 598, 606 (1988) (explaining "jurisdictional factual issues, like other factual issues, remain subject to the usual rules of summary judgment" and therefore genuine factual disputes over jurisdictional facts will preclude court from

JABURG & WILK, P.C.
ATTORNEYS AT LAW
3200 NORTH CENTRAL AVENUE
SUITE 2000
PHOENIX, ARIZONA 85012

8

granting motion under Rule 12(b)(2). As such, because there is clearly sufficient evidence to support a conclusion that Ms. Bird *did* know that Defendants resided in Arizona, their motion must be denied.

### b. Specific Jurisdiction Exists Over Defendants In Arizona

To begin, as is often true in similar cases, Defendants concede that at this time they do not have evidence sufficient to support a finding of general jurisdiction over Ms. Bird or SEOmoz. As such, the question to be addressed is whether specific jurisdiction is present.

The specific jurisdiction test is well-known:

> When a defendant's activities in the forum state are not so pervasive as to subject it to general jurisdiction, the court may still find specific jurisdiction if: (1) the defendant purposefully avails himself of the privilege of conducting business in the forum; (2) the claim arises out of or relates to the defendant's contact with the forum; and (3) the exercise of jurisdiction is reasonable.

*Holland v. Hurley*, ___ P.3d ___, 2009 WL 1383809, *2 (App. 2009) (quoting *Williams v. Lakeview Co.*, 199 Ariz. 1, 13 P.3d 280 (2000)). The "purposeful availment" element does not literally require a defendant to conduct business in the forum state. Rather, this showing is satisfied if the defendant has 'purposefully directed' his *activities* toward the forum. *See Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1155 (9th Cir. 2006)

Of course, in the 25 years since the Supreme Court's classic decision in *Calder v. Jones*, one rule has become clear—"purposeful availment" is established by a defendant knowingly directing and targeting tortious conduct aimed at a resident of the forum state and which cause foreseeable effects in the forum state. Thus, personal jurisdiction is appropriate where a defendant publishes a defamatory article resulting in harm in the forum state:

> [P]etitioners are not charged with mere untargeted negligence. Rather, their intentional, and allegedly tortious, actions were expressly aimed at California. Petitioner South wrote and petitioner Calder edited an article

9

> that they knew would have a potentially devastating impact upon respondent. And they knew that the brunt of that injury would be felt by respondent in the State in which she lives and works and in which the National Enquirer has its largest circulation. Under the circumstances, petitioners must "reasonably anticipate being haled into court there" to answer for the truth of the statements made in their article.

*See Calder v. Jones*, 465 U.S. 783, 789–90, 104 S.Ct. 1482, 1488 (1984). Here, as in *Calder*, Ms. Bird wrote and published a defamatory article about Plaintiffs which was viewable in Arizona and which was intended to cause (and which has actually caused) significant harm to them in the State of Arizona. Based on this, the operative Complaint (Plaintiffs' First Amended Complaint) contains the following jurisdictional allegations:

¶ 11. Defendants have caused events to occur in the State of Arizona, Maricopa County, out of which the Plaintiffs' claims arise and which are the subject of this Complaint.

¶ 18. On or about January 21, 2008, SEOmoz published and began circulating an article titled <u>The Anatomy of a RipOff Report Lawsuit</u>, written by Sarah Bird (the "Article");

¶ 21. The Article contains false, unfair, libelous, and defamatory statements of and concerning the Plaintiffs written by Defendant Bird and published by Defendant SEOmoz.

¶ 72. Defendants made each and every defamatory statement contained in the Article and the Appendix of Cases knowing that said statements were false; in the alternative, Defendants acted in reckless disregard of the truth in making each of the defamatory statements; in the alternative, Defendants was negligent in failing to ascertain the truth of the defamatory statements before making them.

Paragraphs 78–95 of the First Amended Complaint also describe the events surrounding the *Barnes v. Xcentric* litigation including the fact that more than six months prior to the filing of that lawsuit, Plaintiffs wrote to Ms. Bird from Arizona and informed her that her article was encouraging third parties to bring groundless lawsuits containing knowingly false allegations of fact (which is exactly what occurred in the *Barnes*

10

litigation). Rather than taking legitimate any steps to reduce the harm caused by her article, Ms. Bird merely inserted a hard-to-locate footnote in her article contradicting her prior instructions by suggesting that litigants should not file frivolous lawsuits (even though this is exactly what her article instructs people to do). Of course, as Plaintiffs feared, Ms. Bird's instructions were subsequently followed by a party who copied many of Ms. Bird's defamatory statements *verbatim* as factual support for his Complaint. As alleged in ¶ 93 of the First Amended Complaint, those events caused Xcentric and Magedson to expend more than $20,000 in attorney's fees defending the *Barnes* litigation.

Taking all of these allegations as true for the purposes of this motion, nothing more is required to establish a *prima facie* basis to assert personal jurisdiction. *See Bils v. Nixon*, 179 Ariz. 523, 526, 880 P.2d 743, 746 (App. 1994) (personal jurisdiction was properly asserted over New York law firm based on firm's allegedly wrongful use of Arizona resident's credit information because "the alleged conduct of appellees was intentionally directed at an Arizona resident and was calculated to cause injury to him here, their contacts were sufficient to confer personal jurisdiction.")

### c. Defendants Knew Plaintiffs Resided In Arizona

In an effort to avoid jurisdiction, Ms. Bird argues, "At the time she wrote the post, Defendant Bird did not know that Xcentric Ventures was an Arizona corporation. She did not know that Edward Magedson was an Arizona resident. Thus, Defendants could not have expressly aimed an intentional action at Arizona … ." Motion to Dismiss at 10:3–5. To the extent these allegations conflict with the claims stated in the Complaint, they are immaterial to this motion because any such conflicts must be resolved in Plaintiffs' favor. However, as a factual matter, Ms. Bird's allegations are provably untrue.

First, despite Ms. Bird argument that "Defendants' non-commercial blog is not expressly aimed at Arizona … The Blog does not target Arizona residents," the blog article at issue here was <u>solely about Xcentric and Magedson</u>. The article was about the Ripoff Report and only that site. As such, the posting targeted Xcentric and Magedson who are, in fact, Arizona residents.

11

As for evidence showing Ms. Bird's knowledge of Plaintiffs' residency, it is plentiful. First of all, the Terms of Service posted on the Ripoff Report website contain a single address located in Tempe, Arizona:



*See* Gingras Decl. ¶ 6.

Section 11 of the Ripoff Report's Terms of Service include an Arizona choice of law provision and state that "any dispute arising out of or relating to this Agreement shall be subject to the exclusive venue of the federal and state courts in the State of Arizona … ." Gingras Decl. ¶ 7. Under the heading "Want to Sue Ripoff Report?" (located here: http://www.ripoffreport.com/wantToSueRipoffReport.asp), in an effort to deter groundless lawsuits such as the ones encouraged by Ms. Bird, Xcentric specifically explains to readers, "any suit filed against us without probable cause may subject the complaining party and/or their attorneys to liability in the State of Arizona for wrongful use of civil proceedings." Gingras Decl. ¶ 8.

10297-45/DSG/DSG/725139_v1

In addition, a "whois" search for the identity of the operator of the Ripoff Report website reveals an address located in Tempe, Arizona. *See* Gingras Decl. ¶ 10. Also, Xcentric Ventures has a registered address in Arizona with the Arizona corporation commission and is not registered to do business in any state other than Arizona:



*See* Gingras Decl. ¶ 11. Clearly, if Ms. Bird had entertained even the slightest doubts as to the whereabouts of Xcentric or if she had undertaken even the smallest amount of due diligence prior to publishing her article attacking Xcentric and Magedson, she could and would have had little difficulty determining where Xcentric was located.

However, there is much more direct evidence showing that Ms. Bird was well-aware of Plaintiffs status as Arizona residents—her blog clearly demonstrates this fact.

10297-45/DSG/DSG/725139_v1

For example, Ms. Bird's article includes a summary of twenty different cases involving Xcentric, Magedson, or both.  In some cases, Ms. Bird included links in the text of her article directing readers to court documents available for free on www.Justia.com.

In the body of the article, Ms. Bird provided a link to "the Declaration of Dickson Earl Woodard Deposition [sic]" which directs the reader to the following address: http://docs.justia.com/cases/federal/district-courts/texas/txndce/3:2007cv00976/167835/1/2.html By following this link, the reader can access documents from the docket in *GW Equity LLC v. Xcentric Ventures, LLC* (a case previously pending in U.S. District Court in Texas until summary judgment was granted in favor of Defendants in January 2009).  Included among the documents listed on the link provided by Ms. Bird is a copy of the plaintiff's original Complaint in GW Equity which contains an allegation that Xcentric Ventures is an Arizona LLC which is "a citizen of Arizona and no other state."  The same document includes a similar allegation as to Ed Magedson.  Gingras Decl. ¶ 12.



10297-45/DSG/DSG/725139_v1

Of course, Ms. Bird may claim that she provided these links but failed to actually review any of the pleadings which she summarized in her article. While that position strains her credibility, there is simply no question that she did review other documents which informed her of Xcentric's and Magedson's status as Arizona residents.

> ***Hy Cite v. Badbusinessbureau.com***—Filed December 11, 2004, in Arizona District Court under cause number 2:2004cv02856. The plaintiff amended its Complaint to include defamation, RICO Act claims, and trademark infringement. The Court dismissed the trademark associated claims, but ruled that the RICO Act claims and the claims that Magedson authored and/or edited defamatory statements can go forward. The case includes a thoughtful and well-written Order authored by Judge Earl H. Carroll going through the legal arguments and defenses. Surely, this well-reasoned order created the impetus necessary for the parties to settle in May 2007. Interestingly, Hy Cite is still listed on RipOffReport.com, but unlike other rebuttals to complaints, the rebuttal appears in the title and above the Complaint. I speculate that this could have been part of the settlement terms. [Note: Hy Cite originally filed in Wisconsin. However, that case was dismissed because the Wisconsin ruled that it didn't have jurisdiction over RipOffReport.com et al.]

Gingras Decl. ¶ 13. Ms. Bird's reference to a prior Wisconsin lawsuit which was dismissed due to a lack of jurisdiction relates to the District Court's opinion in *Hy Cite Corp. v. Badbusinessbureau.com, LLC*, 297 F.Supp.2d 1154 (W.D.Wis. 2004). In that case, the Court determined that Xcentric's predecessor entity was not subject to jurisdiction in Wisconsin, but that jurisdiction would be proper in Arizona. Of course, Ms. Bird's article clearly demonstrates that she reviewed the Wisconsin court's decision in *Hy Cite* and therefore Ms. Bird would have known that Plaintiffs were residents of Arizona. This point is further established by the fact that of the twenty cases outlined in Ms. Bird's article, Xcentric and/or Magedson were plaintiffs in four of the cases (*Xcentric Ventures v. Stanley*; *Magedson v. Sharp*; *Magedson v. Federated Financial Services*; and *Magedson v. Village Voice Media*), and all such matters were filed in either state or federal court in Arizona. Furthermore, of the sixteen cases in which Xcentric or Magedson were defendants, four were commenced in the Arizona courts.

15

1  Finally, Ms. Bird's article also contains a link to an article written in the Phoenix
2  New Times (http://www.phoenixnewtimes.com/2007-02-01/news/the-real-rip-off-report)
3  about the Ripoff Report website and Mr. Magedson.  The text of Ms. Bird's article
4  indicates that she read the New Times article ("I imagine that Magedson is suing because
5  of this article written in the Pheonix [sic] New Times News.")  Also, Paragraph 15 of Ms.
6  Bird's declaration suggests that she likely read this article prior to posting her story about
7  Plaintiffs; "Prior to placing the post on the Blog, I remember reading an online article that
8  talked about how hard Magedson was to serve … ." (The New Times article specifically
9  mentions the alleged difficulty some plaintiffs have had in serving Mr. Magedson).

10  Assuming that Ms. Bird did, in fact, read the New Times article (which was
11  published on January 31, 2007; nearly one year before the SEOmoz article), then she
12  clearly would have been aware that Mr. Magedson is a resident of Arizona because the
13  article specifically mentioned this fact: "And if Magedson is virtually anonymous in
14  Maricopa County, where he's lived for almost two decades, he's famous on the Internet."
15  (emphasis added).  Gingras Decl. ¶ 16.

16  Taken together, the above points are more than sufficient to support a conclusion
17  that Ms. Bird was, in fact, aware of Xcentric's and Magedson's status as Arizona residents
18  at the time the SEOmoz article was posted.  Indeed, in order to accept Ms. Bird's position,
19  one would have to believe that she selectively avoided reading the case captions or
20  jurisdictional allegations of *any* of the twenty of the cases which she outlined in her
21  article.  One would also have to believe that Ms. Bird deliberately avoiding reading any of
22  the contact information posted on www.RipoffReport.com, and that she failed to read the
23  New Times article which she references and linked to in her posting.  Because Ms. Bird's
24  claimed ignorance of Plaintiffs' residence is the only basis for their motion, and because
25  ample evidence exists to refute that claim, the motion should be denied.

26  Just as the Supreme Court held in *Calder*, knowingly directing false and
27  defamatory statements at the resident of a forum state for the purpose of causing harm to
28  occur there is sufficient to subject the defendant to jurisdiction in the forum.  Here, the

10297-45/DSG/DSG/725139_v1

Complaint alleges that Ms. Bird engaged in precisely this type of jurisdiction-conferring conduct on behalf of herself and her employer, SEOMoz. As a result, it is more than fair for Defendants to anticipate being haled into Arizona in order to defend the accuracy of Ms. Bird's statements and the legitimacy of her positions.

### III.   CONCLUSION

For the reasons stated above, this Court has personal jurisdiction over Defendants. As such, the Court should deny Defendants' Motion to Dismiss.

DATED June 1, 2009.

**JABURG & WILK, P.C.**

/s/ David S. Gingras
Maria Crimi Speth
David S. Gingras
Laura Rogal
Attorneys for Plaintiffs

10297-45/DSG/DSG/725139_v1

# CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2009 I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing, and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Mark G. Worischeck, Esq.
Debora L. Verdier, Esq.
**SANDERS & PARKS, P.C.**
3030 North Third Street
Phoenix, AZ 85012-3099

Attorneys for Defendants

/s/David S. Gingras

18

10297-45/DSG/DSG/725139_v1